Adam NORCROSS, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 218, 2010.

Supreme Court of Delaware.

Submitted: Oct. 9, 2011.
Decided: Dec. 21, 2011.

Jennifer Kate Aaronson, Aaronson, Collins & Jennings, LLC and Joseph A. Gabay, Wilmington, Delaware, for appellant.

John Williams, Department of Justice, Dover, Delaware, for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

STEELE, Chief Justice:

A jury convicted Adam Norcross for the 1996 murder of Kenneth Warren. The trial judge sentenced him to death in 2001. On a motion for postconviction relief, Norcross raises four arguments. First, Norcross argues that the failure to present some mitigation evidence at the penalty hearing constituted ineffective assistance of counsel. Second, Norcross contends that the prosecution tainted the penalty phase with improper questioning and prejudicial comparisons. Third, Norcross challenges the penalty phase jury instructions. Fourth, Norcross contends that the death sentence is unconstitutional because nei-

ther the judge nor the jury found that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. We find no merit to any of these claims and affirm the postconviction judge's denial of Norcross' motion for postconviction relief.

## I. FACTUAL AND PROCEDURAL HISTORY [1]

Shortly after 8 p.m. on November 4, 1996, the Warren family was settling in for a night in their Kenton, Delaware home. Kenneth Warren was sitting at the kitchen bar eating a sandwich while his wife and son relaxed in the family room watching television. Suddenly, two masked men dressed in camouflage burst through the glass patio doors leading to the family room. The intruders shot Kenneth four times while his wife and son watched in horror. The intruders grabbed a purse on the kitchen counter and fled.

One day after the incident, Adam Norcross told coworker Matthew Howell that he and Ralph Swan had gone to commit a robbery that "went bad." Norcross described how Swan got hit in the shoulder with a bullet and Kenneth Warren "fell like a bag of potatoes" when he was shot in the head. Within a day of this conversation, Howell observed that Swan had injured his left shoulder and wore a blood-stained bandage. According to Howell, he did not report this information to the police because Norcross threatened to kill him if he did.

In November 1996, police found the wife's purse behind the rear fence of the Eastern Shore Concrete Company in Middletown, Delaware. The discovery of the purse did not lead to any suspects even though Adam Norcross and Ralph Swan both worked at the Eastern Shore Con-

crete Company at the time of the murder. About a month before the murder, Norcross' former roommate reported the theft of two handguns: a .357 caliber Smith & Wesson revolver and a .40 caliber Smith & Wesson handgun. Examination of the bullets removed from Kenneth Warren's body revealed that the two back wounds were made by .357 caliber bullets and the fatal wound was made by a 10mm/.40 Smith & Wesson caliber triple copper jacketed bullet.

During his employment at Eastern Shore Concrete Company, Norcross dated Gina Ruberto, who testified that one night Norcross was upset and showed her a newspaper article about the murder and robbery. Norcross started crying and told her about breaking into the home while wearing camouflage clothing. Norcross also stated that he took a pocketbook and disposed of it behind a fence at the concrete plant. The concrete plant fired Norcross and Swan in December 1996.

Norcross would later find work on a farm and marry Bridgette Phillips in early 1997. Later that summer, Norcross invited Swan to work with him as a farm hand. One day, Phillips overheard Norcross and Swan laughing about the time Swan got shot. Norcross explained that they had planned to rob an empty house but when they found it occupied, the man fired a shot and died trying "to play hero." Norcross also told Phillips that they would never get caught because they wore masks. Norcross and Phillips separated in December 1997. Two years later, she emailed Delaware State Police. With this break in the case, police arrested Norcross on February 9, 2000.

The trial began April 24, 2001. A Kent County Superior Court jury found Nor-

---

1. The factual background summarizes facts from this Court's opinion on direct appeal in *Norcross v. State*, 816 A.2d 757 (Del.2003) and the trial judge's sentencing opinion in *State v. Norcross*, 2001 WL 1223198 (Del.Super. Oct. 3, 2001).

cross guilty as charged on three counts of first degree murder, six counts of possession of a firearm during the commission of a felony, first degree robbery, first degree burglary, and second degree conspiracy.[2]

## A. The Penalty Hearing

From May 14–18, 2001, the trial judge conducted a penalty hearing to determine whether the aggravating circumstances outweighed the mitigating circumstances. Defense counsel made substantial efforts to assemble mitigation evidence for the penalty hearing. Two employees of the Public Defender's office, Sherri Gigliotti and Lynda Zervas, gathered records and interviewed witnesses in order to strengthen Norcross' mitigation case.

Sherri Gigliotti was a psycho-forensic evaluator for the Public Defender's Office. Her main task was developing mitigating factors for defendants. In this case, Gigliotti arranged for Norcross to meet psychologist Dr. Abraham Mensch and psychiatrist Dr. Stephen Mechanick. She also obtained records from Vero Beach High School, New Dominion School and military records from the U.S. Marine Corps. Gigliotti received Norcross' employment records from various companies, including: Pat's Pizza, Eastern Shore Concrete, Grotto's Pizza, HBS Glass, and Wal–Mart. As part of the investigation, Gigliotti interviewed numerous witnesses, including Kathaleen Norcross and Adam Norcross. Finally, Gigliotti uncovered Norcross' medical history by talking with him and getting records from Union Hospital.

As a senior psycho-forensic evaluator for the Public Defender's Office, Lynda Zervas supervised Gigliotti in the Norcross

case. At a deposition, Zervas testified that she and Gigliotti began meeting with Adam Norcross on April 11, 2000, a mere two months after Norcross was arrested. Zervas recalled that there were issues with Norcross' credibility regarding the sexual abuse claims and the reason the Marines discharged him.[3] After collecting a trove of records, defense counsel presented testimony from eight witnesses as well as from Norcross himself. The themes of the mitigation case centered on defendant's unstable, abused childhood and his ability to do well in a structured environment.

### 1. Beverly Scullion

Adam Norcross' aunt, Beverly Scullion, testified that Adam and his mother moved in with her soon after Adam was born because they had no place to live. Scullion testified that a man named Ed acted as Adam's father figure until Adam was seven. Later, when his mother joined the Army, Adam would act as the man of the house and look after his sister. Finally, Scullion testified that despite desperate pleas from Adam, his mother never told him the name of his real father.

### 2. Rebecca Uniatowski

Rebecca Uniatowski is Beverly Scullion's daughter and therefore Adam Norcross' cousin. Uniatowski described how Adam's uncle physically abused him when they all lived together. She also testified that Adam had a child at sixteen with his mother's friend Ruth Corey, a woman in her late twenties. Uniatowski remembered Adam as a loving person who cried more than usual.

---

**2.** *State v. Norcross,* 2010 WL 1493120 at *2 (Del.Super. Apr. 8, 2010).

**3.** In an email from Gigliotti to Zervas, Sherri notes that the defendant told Dr. Mechanick

that he was kicked out for fighting while military records show that Norcross was "other than honorably discharged" for stealing supplies.

### 3. William Sastram

Norcross' friend for 18 years, William Sastram, recalled that he never saw the violent side of Norcross at any time during his friendship. Sastram also testified that Norcross spent a lot of time at his house growing up because "he never really seemed comfortable in his own house." On cross examination, Sastram discussed a panicked phone call from Norcross soon after the murder where he said that his life was ruined.

### 4. Phyllis Sastram

Phyllis Sastram is William Sastram's mother. She became acquainted with Adam Norcross around 1986, when Norcross lived in Florida. Adam would often go over to help build Sastram's new house and was treated as part of the family. Mrs. Sastram described Adam as a polite, friendly, and warm person. She also testified about a remorseful letter from Norcross concerning where he was now and what happened to him.

### 5. Brian Corbishley

Brian Corbishley lived together with Norcross and his girlfriend Tanya Bennett for six weeks. Corbishley testified that Adam had a good influence on his girlfriend and really calmed Bennett down from her crazy lifestyle which involved alcohol, cocaine, and marijuana. Brian Corbishley also recalled that he never saw Norcross engage in violent behavior with Bennett or anyone else.

### 6. Mary Goerling

Half-sister to Norcross, Mary Goerling lived with Adam when their mother was married to a man named John Barry. Goerling testified that Barry often drank, beat Adam, and broke furniture. Goerling also recalled that Adam would babysit her son Ethan and was "just like an uncle should be."

### 7. Bethany Zeleski

As a friend of Adam Norcross, and mother to one of his children, Bethany Zeleski testified about the time that Norcross was married to someone else—Bridgette Phillips. Zeleski recalled that Norcross took a tough love approach with Phillips but did not orally abuse her. She also emphasized that "he never beat her or hit her physically."

### 8. Rebecca McBride

McBride was the records custodian for the Delaware Correctional Center. She testified that during his time in prison Norcross has been punished for several infractions, including putting a milk carton around a light, having a cigarette lighter on the shelf of his cell, possessing non-dangerous contraband, and failing to obey an order.

### 9. Adam Norcross

Norcross recounted his unstable childhood by beginning with Edwin Norcross, a man Adam believed was his father until he suddenly left with no explanation. Then Norcross described how his Uncle Clarence would drink, get angry, and "start smacking people around." Norcross also testified about living with John Barry, the man his mother later married. According to Adam's testimony, Barry subjected Norcross to various acts of physical and sexual abuse while the family lived in Germany.

When Norcross returned to the United States, he was sent to the New Dominion School, a juvenile correction facility in Virginia. Norcross described an incident with Ruth Corey one weekend when he returned home from school. He testified that she made advances, became sexually active with him, and eventually had his first child.

The trial judge provided a jury instruction after both sides had presented evidence at the penalty hearing. Defense counsel requested that the phrase "conscience of the community" be added to the jury instruction.[4] The judge declined to add the phrase, reasoning that the language adds confusion and is meaningless since the jury is instructed to disregard public opinion. Rather, he included the following language to emphasize the importance of the jury recommendation: "Although the Court is not bound by your recommendation, your recommended answer to the question will be given substantial consideration by the Court and will be an important factor in its final determination of the appropriate sentence."[5]

At the conclusion of the five day penalty hearing, the jury voted 10 to 2 that aggravating circumstances outweighed the mitigating circumstances. On October 3, 2001, the trial judge sentenced both Norcross and Swan to death.[6] The trial judge first noted that Norcross' conviction for first degree murder establishes the existence of a statutory aggravating circumstance. Then the trial judge found a series of other non-statutory aggravating factors.

On the other hand, the judge did not find Adam's remorse as a mitigating factor because of his "prior boastfulness about the murder." Furthermore, he found that Norcross' childhood did not "explain Warren's murder or mitigate the seriousness of the crime." Finally, Norcross' relationship with the Sastram family and willingness to be gainfully employed were mitigating circumstances. In conclusion, the trial judge held that the aggravating circumstances overwhelmed any mitigating factors and imposed a sentence of death.

On direct appeal, we affirmed all of the convictions and the three death sentences.[7] The United States Supreme Court denied Norcross' petition for a writ of certiorari.[8]

## B. Postconviction Proceedings

On July 30, 2004, Norcross filed a *pro se* motion for postconviction relief. New defense counsel filed an amended motion for postconviction relief on February 3, 2006. A Superior Court judge held a Rule 61 evidentiary hearing on February 20, 2007. The postconviction hearings centered on evidence that defense counsel decided not to present as part of Norcross' mitigation case. The unpresented mitigation evidence included four lay witnesses, school records, co-defendant criminal records, and expert psychological and psychiatric testimony.

### 1. Kathaleen Norcross

Adam Norcross' mother, Kathaleen Norcross, testified about Adam's unfortunate life story. She corroborated the story about Ruth Corey giving birth to Adam's daughter when Adam was only 16 years old. She also recalled being notified by teachers about the possibility that Adam had ADHD. On cross examination, Kathaleen Norcross explained that Adam always saw himself as his sister's and his mother's protector.

### 2. Ruth Corey

Ruth Corey, a coworker of Kathaleen Norcross testified that she and Adam Norcross had a consensual sexual relationship in the summer of 1986. She gave birth to Norcross' daughter Katie on April 17, 1987. Corey recalled that Norcross did

---

4. Penalty Phase Tr. vol. A, 2–3, May 14, 2001.

5. Penalty Phase Tr. vol. D, 105, May 17, 2001.

6. *State v. Norcross,* 2001 WL 1223198 (Del.Super. Oct. 3, 2001).

7. *Norcross v. State,* 816 A.2d 757 (Del.2003).

8. *Norcross v. Delaware,* 540 U.S. 833, 124 S.Ct. 80, 157 L.Ed.2d 60 (2003).

not make any personal effort to see his daughter except on one occasion, his daughter's 11th birthday. She also testified that Norcross was consistently in arrears for his child support payments.

### 3. Katie Corey

Adam Norcross and Ruth Corey's daughter, Katie Corey, testified that she was 12 years old when she found out that the police had arrested her father for murder. She recalled that she would get Christmas cards every year from Adam. Although Katie did not have much contact with her father throughout her childhood, she has become closer to her father now. Once she turned 18, Katie Corey started visiting her father at the prison.

### 4. Faith Smith

Faith Smith, an aunt of Adam Norcross, testified about her frequent visits with Adam after his incarceration. According to Smith, Norcross was very upset about the incident and blamed himself during her visits. On cross examination, Smith testified that Norcross often tended to embellish his statements and to not tell the truth. Specifically, she cited Norcross' story that a person named Wayne committed the crime with him, a story she does not believe to be truthful.

### 5. New Dominion School Records

Adam Norcross was placed in the New Dominion School from February 18, 1985 to August 28, 1986 for the following problems: "stole car, shoplifting, runaway, assault, poor peer relationships, difficulty accepting mother's authority, poor school performance, intimidating behavior, passive-aggressive, internalizes feelings, poor self-confidence, low self-esteem, overly responsible at times."[9] According to the discharge summary, Adam made "good

progress" on these problems while at New Dominion. The summary found that "[i]t is important that Adam have a set structure which he can adhere to."[10]

### 6. Co-defendant Swan's Texas Criminal Records

At the postconviction hearing, original defense counsel testified that they had confirmed Swan's criminal history in Texas for business invasions. The Public Defender's Office made attempts to get police reports, conviction information, and court records. After reviewing the documentation, defense counsel chose not to present the information to the jury. Appellant claims that the criminal records would support the mitigating circumstance that Swan led Norcross into criminal activities.

### 7. Dr. Abraham Mensch

Dr. Mensch is a psychologist who testified that there were strong indications of post-traumatic stress disorder from Adam's history of abuse by his stepfather and uncle. He also found traits of antisocial personality disorder. Although Norcross denied Barry had sexually abused him, Dr. Mensch strongly suspected that Norcross had been abused. On cross examination, Dr. Mensch testified about an email written to defense counsel where he stated, "I'm concerned about possible questions that the prosecutor might ask," but could not remember exactly what questions he was concerned about.

### 8. Dr. Stephen Mechanick

Dr. Mechanick is a psychiatrist who recalled that he had questions about Norcross' credibility because after Norcross told Dr. Mechanick about the murder, his statements attributed all of the responsibility to Swan and conflicted with Nor-

9. Op. Br.App. vol. II, A–1761.

10. *Id.*

cross' previous statements. Given that Norcross bragged about the murder, Mechanick also found that Norcross was not remorseful for his actions. Overall, Mechanick testified "that there was a significant risk that [his] testimony would have done more harm than good."

## C. Denial of Postconviction Relief and Opinion on Remand

On April 8, 2010, the Superior Court judge denied postconviction relief. Eight days later, Norcross appealed to this Court. After extensive briefing, we held *en banc* oral argument on January 26, 2011, and we remanded this case to Superior Court for two reasons. First, we requested that the trial judge examine Norcross' ineffective assistance of counsel claim in light of *Williams v. Taylor*,[11] *Wiggins v. Smith*,[12] *Rompilla v. Beard*,[13] *Porter v. McCollum*,[14] *Sears v. Upton*,[15] *Jermyn v. Horn*,[16] and *Outten v. Kearney*.[17] Second, we requested that the trial judge reweigh the totality of the mitigation evidence from both the penalty phase and the postconviction hearing to determine whether Norcross had shown prejudice under *Strickland v. Washington.* On May 11, 2011, the judge issued a perfunctory 7 page opinion on remand. We requested supplemental memorandums and held another oral argument on November 9, 2011.

## II. DISCUSSION

Norcross raises four arguments on appeal. First, Norcross argues that the failure to present mitigation evidence available but not presented at the penalty hearing prejudiced Norcross and warrants a new penalty hearing. Second, Norcross contends that prosecutorial misconduct tainted the proceedings. Third, Norcross challenges the penalty hearing jury instructions. Fourth, Norcross contends that the death sentence is unconstitutional because neither the judge nor the jury found that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt.

 A motion for postconviction relief is reviewed under an abuse of discretion standard.[18] To the extent Norcross raises questions of law or constitutional violations, they will be reviewed *de novo*.[19]

## A. After a de novo review of the complete record, we find that the unpresented mitigation evidence would not alter the totality of evidence sufficiently to change the outcome of the penalty hearing.

 Norcross argues that defense counsel's failure to conduct a reasonable mitigation investigation of, and to present significant mitigation evidence about, Norcross' childhood abuse and brain damage, violated his Sixth Amendment right to ef-

11. 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

12. 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

13. 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005).

14. ⸺ U.S. ⸺, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009).

15. ⸺ U.S. ⸺, 130 S.Ct. 3259, 177 L.Ed.2d 1025 (2010).

16. 266 F.3d 257 (3d Cir.2001).

17. 464 F.3d 401 (3d Cir.2006).

18. *Zebroski v. State*, 12 A.3d 1115, 1119 (Del. 2010).

19. *Hall v. State*, 788 A.2d 118, 123 (Del.2001) (citing *Warren v. State*, 774 A.2d 246, 251 (Del.2001)).

fective assistance of counsel. Constitutional ineffective assistance of counsel claims are reviewed *de novo*.[20] *Strickland v. Washington* requires Norcross to meet a two part test.[21] First, Norcross must show that defense counsel's performance was deficient. Second, Norcross must show that the deficient performance prejudiced his defense.

 Under the first *Strickland* prong, defense counsel is held to the standard of providing reasonably effective assistance.[22] A claim must be based on specific acts or omissions of counsel that are "alleged not to have been the result of reasonable professional judgment."[23] The appellate court then determines whether acts or omissions were outside the "wide range" of professionally competent counsel while also recognizing that "counsel is strongly presumed to have rendered adequate assistance."[24]

 Under the second *Strickland* prong, Norcross must show there is a reasonable probability that, but for counsel's deficient conduct, the result of the proceeding would have been different.[25] A reasonable probability is defined as a probability sufficient to undermine confidence in the outcome.[26] The United States Su-

preme Court provides specific guidance for challenges to a death sentence:

> When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.[27]

To make this determination, we must consider the totality of the evidence, including evidence considered at trial and evidence not presented until postconviction review.[28] In reconstructing the record and reassessing the totality of the evidence,[29] we must also consider contra-mitigation evidence that the State would have presented to rebut the new mitigation evidence.[30]

The United States Supreme Court stated in *Strickland* that "if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."[31] We accept the United States Supreme Court's invitation to analyze the prejudice prong first.

20. *Swan v. State*, 28 A.3d 362, 391 (Del.2011), *reargument denied* (Sept. 27, 2011).

21. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

22. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052.

23. *Id.* at 690, 104 S.Ct. 2052.

24. *Id.*

25. *Id.* at 669, 104 S.Ct. 2052.

26. *Id.* at 693, 104 S.Ct. 2052 ("It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.").

27. *Id.* at 695, 104 S.Ct. 2052.

28. *Id.*

29. *Williams v. Beard*, 637 F.3d 195, 227 (3d Cir.2011).

30. *See, e.g. Wong v. Belmontes*, —— U.S. ——, ——, 130 S.Ct. 383, 390, 175 L.Ed.2d 328 (2009), *reh'g denied*, —— U.S. ——, 130 S.Ct. 1122, 175 L.Ed.2d 931 (2010); *Swan v. State*, 28 A.3d 362 (Del.2011).

31. *Strickland*, 466 U.S. at 697, 104 S.Ct. 2052.

## 1. The aggravating factors are overwhelming

 We begin by reassessing the aggravating factors identified by the trial judge. The trial judge found one statutory aggravating circumstance—that Norcross murdered Warren while committing a robbery.[32] The trial judge also found five non-statutory aggravating circumstances: (1) Norcross' deadly intrusion into Kenneth Warren's home and family was "an aggravating factor of the first magnitude;"[33] (2) the impact of Kenneth Warren's death on those around him, particularly because Norcross knew that he and Swan were destroying a family when they murdered him; (3) Kenneth Warren's high regard in the community; (4) Norcross' admitted and unapologetic criminality; and (5) Norcross threatening to harm those he spoke to about his involvement in the Warren homicide if they told the police.

On direct appeal, we emphasized the disturbing nature of the aggravating circumstances in our automatic review of any death penalty case:

> What happened on November 4, 1996, is every family's worst nightmare. Warren and his wife were in their home, relaxing together after a long day of work, enjoying time with their happy, active young son. They did nothing to place themselves in jeopardy, like opening the door to a stranger. They had every reason to believe that they were safe. The fact that Warren was slaughtered in his own home in front of his wife and son is an aggravator of enormous importance.

The ruthlessness of this crime is compounded by the fact that Norcross saw the Warren family through the patio doors before he broke in. So Norcross knew he would be confronting Warren. Norcross had a gun, and could have demanded valuables if that was what he wanted. But Warren was given no chance to comply with any demands. He was attacked immediately and brutally murdered. Norcross may have told people that he did not mean to hurt anyone, but his actions belie such self-serving comments. Norcross told the police that he gets a "rush" from breaking and entering, and with friends he joked and bragged about the killing. This was not a robbery "gone bad." It was a vicious, unprovoked, random act of violence of the highest order.[34]

Having reassessed the complete record, we agree with the trial judge that the aggravating circumstances are of "overwhelming weight."[35]

## 2. The new mitigating factors are cumulative, irrelevant, or detrimental to Norcross' mitigation case.

 The trial judge identified two mitigating circumstances in the sentencing opinion: Norcross' friendly and helpful relationship with the Sastram family and his ability to almost always be employed as an adult. Although the trial judge found Norcross to be remorseful while before him, the judge discounted the credibility of that remorse "because of his prior boastfulness about the murder."[36] Finally, the trial judge cited Norcross' unstable childhood and reports of physical and sexual abuse, but found that they "do not explain Warren's murder or mitigate the seriousness of the crime."[37] Having independent-

---

32. *State v. Norcross*, 2001 WL 1223198 at *1 (Del.Super. Oct. 3, 2001) *aff'd*, 816 A.2d 757 (Del.2003).

33. *Id.* at *3.

34. *Norcross v. State*, 816 A.2d 757, 768 (Del. 2003).

35. *State v. Norcross*, 2001 WL 1223198 at *7.

36. *Id.* at *5.

37. *Id.*

ly reviewed the record, we agree with the trial judge's findings.

■ During postconviction proceedings, Norcross presented additional mitigating evidence in three categories: (1) testimony from four lay witnesses, (2) two pieces of documentary evidence, and (3) testimony from psychiatric and psychological experts. The addition and incorporation of this unpresented evidence into the evidence that was presented, does not show a reasonable probability that the result of the penalty phase would have been different.

Kathaleen Norcross' testimony at the postconviction hearing is cumulative to that of the eight other witnesses presented during the penalty phase. Defense counsel decided not to call her to the stand because of a concern that she would commit perjury by making self-serving comments and denying that Adam had a hard childhood. At the postconviction hearing, Kathaleen read from a report prepared by the defense team that describes her as saying "her children would always be confident, that they were well loved, and she did not think that Adam's life was chaotic and dysfunctional." [38] To the extent Kathaleen actually presented new evidence, her testimony would actually cut in favor of the State by hurting defense counsel's mitigation strategy.

Ruth Corey's testimony was cumulative to the penalty hearing testimony provided by Rebecca Uniatowski, that Corey had a sexual relationship with Norcross when he was 15 and gave birth to Norcross' first child. It is reasonable for defense counsel to want to present the evidence without having Ruth Corey take the stand during the penalty hearing. Ruth Corey testified at the postconviction proceeding that Norcross never made an effort to see his daughter except for the one occasion of his daughter's 11th birthday. The trial judge correctly found that "new defense counsel has not indicated how this information would have affected the proceedings one way or another." [39] Therefore, a reasonable sentence would not gain any significant mitigation evidence from Corey's testimony.

At the postconviction hearing, Katie Norcross testified that she loved her father and started to visit him after he went to prison. Norcross argues that his relationship with his daughter should be a mitigating circumstance. But new mitigation testimony must be considered along with any counter mitigation testimony presented by the State. [40] When counsel asked how Norcross viewed his responsibilities as a father at the penalty hearing, his half-sister, Mary Goerling responded, "most of the time he would try to blow it off." [41]

The final lay witness that Norcross claims defense counsel should have called is his aunt, Faith Smith, to testify about Norcross' remorse. This testimony would be cumulative because Norcross took the stand in the penalty hearing and expressed his remorse directly to the jury. Regarding Smith's testimony, defense counsel would also have to take the good with the bad. Smith testified that Norcross never admitted to shooting Warren [42] and had a tendency not to tell the truth. [43] Incorporation of this testimonial evidence actually

**38.** Rule 61 Hearing Tr. vol. A, 70, Feb. 20, 2007.

**39.** *State v. Norcross*, 2010 WL 1493120 at *4.

**40.** *Swan v. State*, 28 A.3d 362, 392 (Del.2011).

**41.** Penalty Phase Tr. vol. C, 148, May 16, 2011.

**42.** Rule 61 Hearing Tr. vol. C, 179 (Feb. 22, 2007).

**43.** *Id.* at 180.

strengthens the trial judge's finding that any expressed remorse should be heavily discounted.

Turning to the documentary evidence, Norcross claims that failing to present his New Dominion School records, which show that he would benefit from a more structured environment, constitutes ineffective assistance of counsel. The trial judge astutely found, however, that the State could easily rebut this claim by pointing to Norcross' service in the Marine Corps.[44] Despite the highly structured environment of military life, the Marine Corps gave Norcross an "other than honorable" discharge for theft of supplies. Therefore, the school records would not have established the claimed mitigating factor that Norcross would perform well in a structured environment.

Norcross also contends that defense counsel should have presented co-defendant Swan's criminal records from Texas. The relevance of this mitigation evidence is not immediately apparent, but according to defense counsel, one can infer that the criminal records establish that Swan led Norcross into criminal activity.[45] Unfortunately, Norcross recently testified that Swan was not involved in the murder at all, and that a mysterious man named "Wayne" was his accomplice.[46] Given Norcross' later testimony that Swan was not involved at all, we find that introducing Swan's criminal records would have harmed, not helped, his case.

Finally, Norcross claims that defense counsel ineffectively failed to present expert testimony from Dr. Mensch and Dr. Mechanick. Dr. Mensch diagnosed Norcross with antisocial personality disorder and elements of suggestibility but also "questioned whether Norcross was overstating his problems."[47] Even if the diagnosis is reliable, having an antisocial personality does not present a mitigating circumstance for murdering someone. Furthermore, Dr. Mensch testified to having written an email to defense counsel where he stated, "I'm concerned about possible questions that the prosecutor might ask" if he were to take the stand.

According to a defense team memorandum, "the most Dr. Mechanick could say was that Norcross had childhood problems that affected him as an adult."[48] Dr. Mechanick specifically found that Norcross' conflicting versions indicated a lack of remorse.[49] Both doctors questioned Norcross' credibility.[50] After evaluating the totality of this expert testimony, we conclude that it would not have changed the outcome of the penalty hearing.

3. **Norcross has not shown a reasonable probability that the result of the penalty phase would have been life imprisonment.**

With this expanded record in mind, we now "reweigh the evidence in aggravation against the totality of available mitigating

---

44. *State v. Norcross*, 2010 WL 1493120 at *4 ("When Movant was 22 he joined the Marine Corps, which provides a highly structured environment, but he was not able to function within its confines. He received an 'other than honorable' discharge for theft of supplies despite the structured nature of military life.").

45. Op. Br. at 22.

46. At a hearing for codefendant Swan's motion for new trial, Norcross testified that

Wayne was present at the murder scene and Swan was not there that evening. Hearing Tr. 10–11, Feb. 17, 2006.

47. *State v. Norcross*, 2010 WL 1493120 at *5 ("he also questioned whether Norcross was overstating his problems.")

48. *Id.*

49. *Id.*

50. *Id.*

evidence"[51] and determine whether Norcross has shown a reasonable probability that the result of the penalty hearing would have been different with this mitigation evidence.[52]

■■■ Norcross argues in his opening brief that "there is sufficient support for a finding of a reasonable probability that a *single juror* may have returned a life verdict in this case."[53] It is not immediately clear where Norcross obtains the legal basis for asserting this standard for determining prejudice. Presumably, defense counsel incorrectly construes language from *Outten v. Kearney*.[54]

In *Outten*, the Third Circuit held that trial counsel failed to conduct a reasonable investigation of the defendant's background in preparation for the penalty hearing and that this limited scope of investigation prejudiced the defendant. The key passage summarizing the Third Circuit's analysis of the prejudice prong follows:

> In evaluating the totality of the evidence, both introduced at trial and in the habeas proceedings, we conclude that '[h]ad the jury been able to place [Outten's] excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror [or more] would have struck a different balance.' Because the jury recommended death by the narrow margin of 7 to 5, persuading even one juror to vote for life imprisonment could have made all the difference. This without doubt satisfies *Strickland*'s prejudice prong.[55]

Under one reasonable interpretation of this passage, prejudice is established when there is a reasonable probability of showing that the new evidence would have changed the mind of a single juror. But that reading would be wrong, at least in Delaware.[56] The critical language "at least one juror" was taken from *Wiggins v. Smith*, a case that originated in Maryland,[57] whose law requires a unanimous jury vote to impose a death sentence.[58] Therefore, a defendant convicted of capital murder in Maryland can be spared a death sentence by a single juror's vote.

■■■ Delaware's scheme is quite different. In Delaware, a single juror vote in favor of life will not automatically preclude a death sentence. Under the Delaware death penalty statute,[59] a jury must first determine and unanimously vote on the presence of at least one statutory aggravating factor,[60] and only then will the jury determine whether aggravating factors

51. *Swan v. State*, 28 A.3d 362, 395 (Del.2011).

52. *Id.*

53. Op. Br. at 48 (emphasis added).

54. *Outten v. Kearney*, 464 F.3d 401 (3d Cir. 2006).

55. *Outten*, 464 F.3d at 422–23 (3d Cir.2006) (citing *Wiggins v. Smith*, 539 U.S. 510, 537, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)).

56. Even if one were to interpret the rule narrowly to apply when the jury recommends the death sentence by a margin of 7 to 5, it would still be incorrect because the trial judge—not the jury—makes the final determination of the sentence.

57. *Wiggins v. Smith*, 539 U.S. 510, 537, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

58. *See*, MD.CODE ANN., CRIM. LAW § 2–303(i)(3) ("If the determination is by a jury, a decision to impose a death sentence must be unanimous ...").

59. 11 *Del. C.* § 4209.

60. 11 *Del. C.* § 4209(c)(3)(b)(1) ("In order to find the existence of a statutory aggravating circumstance as enumerated in subsection (e) of this section beyond a reasonable doubt, the jury must be unanimous as to the existence of that statutory aggravating circumstance.").

outweigh mitigating circumstances.[61] The jury's vote, furthermore, is a *non-binding recommendation* that by statute is given "such consideration as deemed appropriate by the Court in light of the particular circumstances or details of the commission of the offense and the character and propensities of the offender as found to exist by the Court." [62] In Delaware, the trial judge has the sole discretion to determine whether to impose a death sentence, and will give appropriate weight to the jury's recommendation depending on the facts of the particular case.[63] If that is an accurate interpretation of *Outten,* then we must conclude that, given the citation to *Wiggins,* the *Outten* court confused Maryland's sentencing scheme with that of Delaware's.

Alternatively, *Outten* might possibly be read to mean that a change of one juror constitutes prejudice, because that single change may influence the trial judge to render a different sentence. This reasoning is logical in theory, but a change in one juror's vote is unlikely to create a reasonable probability that the trial judge's sentence would have been different. *Outten*'s facts presented perhaps the strongest case, because in Delaware a one vote change to a 7–5 jury to vote for death would no longer result in a death sentence recommendation,[64] but that now neutral recommendation would not relieve the trial judge of the duty to independently weigh the mitigating and aggravating factors before imposing an appropriate sentence. In

a Delaware judge's weighing process, the jury's recommendation receives "appropriate" weight, not determinative weight, as is the case in Maryland. Therefore, we find that "the one juror" rationale applied in *Outten* does not satisfy the *Strickland* prejudice requirement as it applies to the Delaware statutory scheme.

■ We reaffirm our adherence to the standard, established in *Strickland,* that "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." [65] After a *de novo* review of the complete record, we conclude that Norcross has not met his burden of showing a reasonable probability that the new mitigation evidence, if presented, would have resulted in a life sentence. The weight of the earlier aggravating circumstances still overwhelms the combination of the earlier mitigation evidence and the new mitigation evidence, the latter being in all material respects cumulative and speculative.

Because, Norcross has not demonstrated prejudice under *Strickland,* we need not determine whether defense counsel was deficient. The ineffective assistance of counsel claim fails.

## B. *The trial judge properly found no prosecutorial misconduct.*

Norcross next argues that five instances of prosecutorial misconduct occurred during the penalty phase of the trial. They are based on (1) an improper question

---

**61.** See, 11 *Del. C.* § 4209(c)(3)(a)(2) ("Whether, by a preponderance of the evidence, after weighing all relevant evidence in aggravation or mitigation which bear upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist.").

**62.** 11 *Del. C.* § 4209(d)(1).

**63.** *Id.* ("The jury's recommendation shall not be binding upon the Court.").

**64.** In *Outten,* the jury voted 7 to 5 in favor of a death sentence. A change in one juror's vote would do no more than create a 6 to 6 split—arguably, no recommendation either way.

**65.** *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

about Jerry Springer, (2) a prejudicial comparison of Norcross to the victim, (3) an incorrect statement of mitigation evidence, (4) Gunnery Sergeant Booker's opinion testimony, and (5) Tanya Bennett's testimony. Defense counsel presents all five claims under Superior Court Rules of Criminal Procedure Rule 61, which governs postconviction relief. The threshold issue is whether these claims are procedurally barred under Rule 61(i). We find that the first three claims are procedurally barred and that the final two claims are without merit.

### 1. Norcross's first three claims are procedurally barred.

 Norcross first argues that his rights were violated when the prosecutor asked him whether he had ever seen the Jerry Springer Show.[66] Under Rule 61(i)(3), grounds for relief that could have been asserted leading up to the conviction are barred, unless (1) the Movant shows cause for relief from the procedural default and (2) the violation prejudiced the movant's rights.[67] This claim was not raised or fairly presented on direct appeal.[68] Rule 61(i)(3) bars this unpresented and unpreserved claim. Furthermore, Norcross has not demonstrated that the resulting violation prejudiced his rights. The trial judge specifically found that Rule 61(i)(3) barred the claim based on the Jerry Springer question. We agree.

 Second, Norcross argues that defense counsel was ineffective for failing to object to the prosecutor's comparison of Norcross to the victim. According to Norcross, that comparison inflamed and prejudiced the jury. Under Rule 61(i)(4), any claim that was formerly adjudicated is barred unless its reconsideration is warranted in the interest of justice.[69] We have previously considered this claim and rejected it. On direct appeal, we considered the following argument: "Norcross complains that, in closing arguments during the penalty phase of the trial, the prosecutor improperly encouraged the jury to compare the value of Warren's life with Norcross's."[70] We found nothing improper about the prosecutor's statements and reasoned that the prosecutor may "remind '[the jury] that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.'"[71] Therefore, this

---

66. Penalty Phase Tr. vol. D, at 88, May 17, 2001.

> Mr. O'Neill: Isn't it fair to say that you've seen Jerry Springer before?
> Mr. Schmid: Your honor—
> The Court: I'm intrigued by what the next question might be. Have you seen the Jerry Springer Show?
> Norcross: Once or twice, your Honor.
> The Court: What's your next question, Mr. O'Neill?
> Mr. O'Neill: I don't think I have any more questions, your Honor. Thank you.

67. Super. Ct.Crim. R. 61(i)(3) ("Any ground for relief that was not asserted in the proceedings leading to the judgment of conviction, as required by the rules of this court, is thereafter barred, unless the movant shows (A) Cause for relief from the procedural default

and (B) Prejudice from violation of the movant's rights.").

68. *State v. Norcross*, 2010 WL 1493120 at *6 (Del.Super. Apr. 8, 2010).

69. Super. Ct.Crim. R. 61(i)(4) ("Any ground for relief that was formerly adjudicated, whether in the proceedings leading to the judgment of conviction, in an appeal, in a postconviction proceeding, or in a federal habeas corpus proceeding, is thereafter barred, unless reconsideration of the claim is warranted in the interest of justice.").

70. *Norcross v. State*, 816 A.2d 757, 766 (Del. 2003)

71. *Norcross v. State*, 816 A.2d 757, 766 (Del. 2003) (citing *Red Dog v. State*, 616 A.2d 298, 310 (Del.1992)).

claim is barred as formerly adjudicated.

■ The third claim is based on one sentence during closing argument where the prosecutor stated: "His background and childhood does not justify and does not excuse and is not mitigation for the senseless, cruel, unwarranted murder of Kenneth Warren ..." [72] Defense counsel argues that the prosecutor incorrectly characterized the nature of mitigation evidence and that defense counsel was ineffective for failing to object. Under Rule 61(i)(1), a motion for postconviction relief must be filed within one year of the conviction.[73] This claim is barred under Rule 61(i)(1) because it was not asserted within one year after the judgment of conviction became final. The period for postconviction relief commenced when the United States Supreme Court denied Norcross's petition for certiorari on October 6, 2003.[74] Norcross filed a *pro se* motion for postconviction relief in 2004 and new counsel filed an amended motion in 2006. The amended motion for post conviction relief did not assert this claim. Therefore, this claim is procedurally barred because the one year time limitation expired.[75]

Although the trial judge cited Rule 61 at least ten times in his opinion denying the motion for postconviction relief, appellant curiously fails to cite Rule 61 once in his 72 page opening brief. Rule 61(i)(5) provides an exception for jurisdictional claims and for claims that a constitutional violation created a miscarriage of justice.[76] Norcross does not present arguments that that exception applies, and the trial judge explicitly held that the Rule 61(i)(5) exception had not been invoked.[77] We find that the miscarriage of justice exception does not apply.

### 2. The claims based on witness testimony are meritless

■ Norcross' fourth prosecutorial misconduct claim is that defense counsel was ineffective for failing to object to Gunnery Sergeant Booker's opinion that "anyone can change his ways, but a man without a conscience is potentially dangerous." [78] According to defense counsel, that opinion testimony was without foundation and speculative. The evidence shows, however, that Sergeant Booker supervised Norcross while they were stationed at Camp Lejeune, had daily contact with Norcross for approximately three months, and evaluated Norcross as part of his responsibilities for Marines under his

---

**72.** Penalty Phase Tr. vol. D, 193, May 17, 2001.

**73.** Super. Ct.Crim. R. 61(i)(1) ("A motion for postconviction relief may not be filed more than one year after the judgment of conviction is final or, if it asserts a retroactively applicable right that is newly recognized after the judgment of conviction is final, more than one year after the right is first recognized by the Supreme Court of Delaware or by the United States Supreme Court.").

**74.** *Norcross v. Delaware*, 540 U.S. 833, 124 S.Ct. 80, 157 L.Ed.2d 60 (2003).

**75.** Even if we had not determined that the issue was barred, the trial judge found that the statement is at most harmless error because the judge instructed the jury to consider the mitigation evidence and limit the scope of

the lawyer's input on the issue. *State v. Norcross*, 2010 WL 1493120 at *8.

**76.** Del.Super. Ct.Crim. R. 61(i)(5) ("The bars to relief in paragraphs (1), (2), and (3) of this subdivision shall not apply to a claim that the court lacked jurisdiction or to a colorable claim that there was a miscarriage of justice because of a constitutional violation that undermined the fundamental legality, reliability, integrity or fairness of the proceedings leading to the judgment of conviction.").

**77.** *State v. Norcross*, 2010 WL 1493120 at *6 ("Under the "fundamental fairness" exception of Rule 61(I)(5), Movant also fails.").

**78.** Penalty Phase Tr. vol. C, 15, May 16, 2001.

supervision.[79] Sergeant Booker was also available for defense cross examination to challenge his evaluation of Norcross. Therefore, we affirm the trial judge's finding that Norcross "has not made a viable challenge to the admission of Sgt. Booker's testimony."[80]

▇ Finally, Norcross argues that trial counsel was ineffective for failing to object to Tanya Bennett's testimony that Norcross, when watching NYPD Blue on television, commented, "the first time you kill someone, it's hard, but the second time it gets easier."[81] Defense counsel claims that the statements were inflammatory and prejudicial. The ineffective assistance of counsel claim fails because trial counsel did object to Bennett's statement.[82] The trial judge ruled against Norcross because the impact of that testimony could be nullified by pointing to Bennett's acknowledgement that Norcross made the remark in jest.[83] We find that trial counsel was not ineffective in its response to Tanya Bennett's testimony.

## C. The trial judge did not err by eliminating "conscience of the community" and "great weight" from the jury instructions.

Norcross claims that trial counsel's failure to appeal the jury instruction constituted ineffective assistance of counsel. Defense counsel challenges two specific changes to the jury instructions. First, the trial judge changed the instruction to state that he would give the jury's recommendation "substantial consideration," not "great weight." Second, the trial judge eliminated the phrase "conscience of the community" from the instruction.

▇ According to 11 *Del. C.* § 4209(d)(1), "The jury's recommendation concerning whether the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist shall be given *such consideration as deemed appropriate* by the Court."[84] Therefore, the trial judge is authorized to give only substantial consideration to the jury recommendation in light of the circumstances of the conviction and the character of the offender. We agree that "based on the clear language of the statute, [Norcross] cannot show either attorney error or prejudice." Norcross' claim for ineffective assistance of counsel on this basis fails.[85]

▇ Elimination of "conscience of the community" from the jury instruction did not prejudice Norcross. Although the defendant is entitled to a correct statement of the substantive law, a specific instruction that the jury represents the conscience of the community is not mandated.[86] Norcross offers no authority to show that "conscience of the community" is a constitutionally required part of the jury instructions in a capital case penalty phase. Viewing the instructions as a whole, those two changes did not undermine the jury's ability to perform its duty. Accordingly, there is no basis to find prej-

79. Penalty Phase Tr. vol. C, 7–16, May 16, 2001.

80. *State v. Norcross,* 2010 WL 1493120 at *7.

81. Penalty Phase Tr. vol. B, 64, May 14, 2001.

82. *Id.* at 14–15.

83. *Id.* at 71.

84. 11 *Del. C.* § 4209(d)(1) (emphasis added).

85. *State v. Norcross,* 2010 WL 1493120 at *9.

86. *See e.g., Cabrera v. State,* 747 A.2d 543, 544 (2000).

udice resulting from the claimed ineffective assistance of counsel.

### D. *Delaware's sentencing procedure does not violate Ring*

 Norcross argues that Delaware's statute is unconstitutional because it does not require, as stated in *Ring v. Arizona,*[87] that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. This claim is essentially identical to that presented on direct appeal, which we summarized as follows: "Norcross argues that the recent United States Supreme Court decision in *Ring v. Arizona* rendered unconstitutional the 1991 version of Delaware's death penalty statute, 11 *Del. C.* § 4209." [88]

This issue is procedurally barred under Rule 61(i)(4) because it was formerly adjudicated on direct appeal.[89] In *Brice v. State,*[90] we answered four certified questions about the constitutionality of 11 Del. C. § 4209 and found that *Ring v. Arizona* only applies to the narrowing phase of the sentencing process. The *Brice* Court reasoned that *Ring*'s constitutional requirement is satisfied once the jury finds the existence of a statutory aggravating circumstance beyond a reasonable doubt. In 2003, we applied *Brice* to Norcross' case:

> In this case, Norcross was sentenced under the 1991 version of § 4209, which did not require the jury to find the existence of a statutory aggravator unanimously and beyond a reasonable

doubt. But the jury did meet the *Brice* standard, since it convicted Norcross of, among other crimes, two counts of felony murder under 11 *Del. C.* § 636(a)(6), and a conviction under § 636(a)(2)-(7) establishes the existence of a statutory aggravator under § 4209(e)(2). In *Brice,* this Court held that § 4209(e)(2) satisfies *Ring.* Thus, we conclude that the 1991 version of § 4209 is constitutional as applied to Norcross.[91]

Norcross presents no reason why the interests of justice should override this procedural bar. Because the issue has been formerly adjudicated, the *Ring* challenge is barred.

### III. CONCLUSION

For the foregoing reasons, none of Norcross' claims have merit. Therefore, the judgment of the Superior Court judge denying Norcross' motion for postconviction relief is affirmed.

**87.** *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

**88.** *Norcross v. State,* 816 A.2d 757, 767 (Del. 2003).

**89.** Super. Ct.Crim. R. 61(i)(4) ("Any ground for relief that was formerly adjudicated, whether in the proceedings leading to the judgment of conviction, in an appeal, in a postconviction proceeding, or in a federal habeas corpus proceeding, is thereafter barred, unless reconsideration of the claim is warranted in the interest of justice.").

**90.** *Brice v. State,* 815 A.2d 314, 327 (Del.2003) ("If *Ring* applies to Delaware at all, it only reaches the 'narrowing phase' of the sentencing process ...").

**91.** *Norcross v. State,* 816 A.2d 757, 767 (Del. 2003).